IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| LINDA D.[1], | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) Civil Action No. 7:19cv00595 |
| | ) |
| ANDREW SAUL, | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

### REPORT AND RECOMMENDATION

Plaintiff Linda D. ("Linda") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding her not disabled and therefore ineligible for Supplemental Security Income ("SSI") under the Social Security Act ("Act"). 42 U.S.C. § 1381-1383f. Linda alleges that the Administrative Law Judge ("ALJ") erred by failing to properly: (1) assess her mental impairments; (2) weigh third-party statements; (3) weigh the medical opinion of her treating physician; and (4) assess Linda's allegations regarding her symptoms.

I conclude that substantial evidence supports the Commissioner's decision in all respects. Accordingly, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. 14), and **DENYING** Linda's Motion for Summary Judgment (Dkt. 10).

### STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Linda failed to demonstrate that she was disabled

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

under the Act.[2] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); see also Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Mastro, 270 F.3d at 176 (quoting Craig v. Chater, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). "The inquiry, as is usually true in determining the substantiality of evidence, is case-by-case." Biestek, 139 S. Ct. 1148. The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Linda filed for SSI in December 2015, claiming that her disability began on December 1, 2007, due to bipolar disorder, schizophrenia, obsessive compulsive disorder ("OCD") and split

---

[2] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

personality disorder. R. 161, 195.[3] The state agency denied Linda's claim at the initial and reconsideration levels of administrative review. R. 72–82, 84–102. ALJ Raymond Rodgers held a hearing on May 11, 2018 to consider Linda's claims for SSI, where vocational expert Harry Tanzey testified. Linda proceeded pro se at the hearing, but subsequently obtained counsel. On August 30, 2018, the ALJ entered his decision considering Linda's claims under the familiar five-step process[4] and denying her claim for benefits. R. 10–20.

The ALJ found that Linda suffered from the severe impairments of bipolar disorder, anxiety, personality disorder, and opiate dependence.[5] R. 13. The ALJ determined that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 13–14. Specifically, the ALJ considered listing 12.04 (depressive, bipolar, and related disorders), listing 12.06 (anxiety and obsessive-compulsive disorders), and listing 12.08 (personality and impulse-control disorders). R. 13. The ALJ found that, regarding her mental impairments, Linda had moderate limitations in understanding, remembering, and applying information, interacting with others, and concentration, persistence, or pace, and mild limitation in adapting or managing oneself. R. 13–14.

---

[3] Linda was 33 years old on the date she filed her application for disability, which is considered a younger individual under the Medical Vocational Guidelines. R. 19.

[4] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the RFC, considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

[5] The ALJ found that Linda's dysuria, headaches, and hypokalemia did not meet the durational requirements of a severe impairment. R. 13. Likewise, the ALJ found that Linda's history of Hepatitis C, back and neck pain, degenerative disc disease, and fibromyalgia, did not require treatment during the relevant period and were not severe. Id.

The ALJ concluded that Linda retained the residual functional capacity ("RFC") to perform a full range of exertional work, but with non-exertional limitations. Specifically, the ALJ found Linda was limited to simple, routine, and repetitive tasks, with no fast-paced production, in a low-stress job defined as only occasional decision-making and only occasional changes in the work setting. R. 14. Further, Linda could have only occasional interaction with supervisors, less than occasional interaction with coworkers, no interaction with the public, and no exposure to hazardous machinery or unprotected heights. Id. The ALJ determined that Linda was unable to perform her past relevant work as a cashier, certified nursing assistant, housekeeper, and retail laborer, but that she could perform jobs that exist in significant numbers in the national economy, such as grader sorter, laundry worker, and stocker. R. 19–20. Thus, the ALJ concluded that Linda was not disabled. R. 20. Linda appealed and the Appeals Council denied her request for review on July 23, 2019. R. 1–3.

## ANALYSIS

Linda alleges that the ALJ failed to properly assess her mental impairments, weigh third-party statements and the medical opinion of her treating psychiatrist, Robert Dean, M.D., and assess her allegations regarding her symptoms.

**A. Medical History**

1. Mental Impairments

Linda has a history of mental health and substance abuse issues, including prior to filing for SSI benefits in 2015.[6] Linda was incarcerated from May 2014 through December 2015 and

---

[6] In 2008, Linda was admitted to New Horizons because of "agitated and destructive behavior" and her psychiatric progress notes indicate a "long history of pain medication abuse" and diagnosed substance induced mood disorder, rule out underlying major depression, recurrent, and history of OCD. R. 292–93. At her initial appointment with the New River Valley Community Services Board, in August 2013, she was diagnosed with alcohol dependence, opioid dependence, and depressive disorder. R. 654. Linda had several follow-up appointments with continued complaints of mental health symptoms, including mood swings, and depression, and was also diagnosed with bipolar I disorder. R. 631.

4

filed for benefits shortly after being released.[7] R. 655. While in jail, Linda presented for several mental health evaluations and participated in one group treatment session, before missing two sessions and being removed from the group. R. 373. During this time, her mental status exams were largely normal, she indicated she wanted to focus on controlling her anger, had complaints of apathy or anxiety, and was recommended for special housing, as an "at risk" offender. R. 375–78, 380. In November 2015, shortly prior to release, she was noted to be "stable and appropriate for release to community at this time." R. 371.

Following her release from jail in December 2015, she presented again to the New River Valley Community Services Board for outpatient evaluation, stating she wanted to maintain her focus on "keeping her anger under control" and was referred to counselor Justin Jordan. R. 490. At her counseling session in January 2016, she discussed having a relapse with opiates, but staying "mostly sober." R. 497. Counselor Jordan noted that, "all prior mood cycling occurred within the context of drug use, making it unclear how mood cycles may manifest without the ups and downs of drug use." R. 497. Likewise, at an initial appointment with Dr. Dean in January 2016, he noted Linda has been "diagnosed in the past with bipolar disorder, primarily because of her explosive anger and aggressive episodes, which I am unable to separate from her substance use."[8] R. 499. On mental status exam, she was generally normal, with limited insight, but Dr. Dean noted he was "unable to reach a definitive assessment given her level of drug and alcohol use." R. 501.

---

[7] Linda has been incarcerated twice for assault and battery of a police officer, and reports "about five assault and battery charges" and "more than a dozen drunk in public charges." R. 406. However, as of 2016, she reports she has "slowed down on her drinking." R. 406.

[8] Dr. Dean noted that both of Linda's assaults on police officers, and her assault on a stranger during her parole, occurred when Linda was intoxicated on alcohol or opioids. R. 499.

5

Linda was admitted to the hospital on temporary restraining orders in July, August and September 2016, and January 2017, with suicidal or homicidal ideations.[9] R. 406, 466, 1069. On discharge, she was in stable condition, with a diagnosis of intermittent explosive disorder, polysubstance abuse and dependence, substance-induced mood disorder, impulse control disorder, and personality disorder. R. 403, 465. Dr. Dean wrote in December 2016 that her sobriety had "ended her cycle of hospitalizations." R. 1045.[10]

Linda continued to see Dr. Dean, as well as counselor Jordan, for multiple follow-up visits, and reported varying levels of opioid and alcohol abuse, with some maintenance of sobriety on Suboxone, but had generally normal mental status exams, except for insight and judgment, and continuing issues with anger, depression, and anxiety.[11] R. 538, 528–29, 682, 752–55, 1010, 1015, 1032, 1045. However, in March 2017, Linda was discharged from the Suboxone Clinic because of multiple drug screen results showing marijuana use. R. 1220. Thereafter, she continued to follow up with providers at New River Valley Community Services, indicating she was using Suboxone "off the street" to manage withdrawal symptoms, as well as marijuana, occasionally. R. 1250, 1276, 1285. Linda testified at the May 2018 hearing that she was currently "clean and sober," and had been since approximately November 2016. R. 64.

2. Medical Opinion Evidence

In March 2018, Dr. Dean wrote a letter, purportedly "in support of [Linda's] disability." R. 1309. Dr. Dean indicated that Linda has "great impairments in attention and concentration,

---

[9] At the September 2016 intake, she admitted to using cocaine again "on a daily basis" though she had recently stopped. R. 466.

[10] Of course, Linda was hospitalized again in January 2017. R. 1069. However, the hospital records indicate that "apparently she is not on any drugs." Id.

[11] In December 2015, counselor Jordan indicted that, "depression symptoms are becoming more prominent as Linda avoids drug use. She has now maintained sobriety for two weeks." R. 1033.

6

distractibility, anxiety, and emotional regulation" and normal workplace demands would overwhelm her coping. Id. Dr. Dean acknowledged Linda's substance abuse history, further indicating that she has "improved since she stopped using but remains impaired." Id.

In March and November 2016, respectively, state agency psychologists, Joseph Leizer, Ph.D. and Hillery Lake, reviewed the record and both found that Linda was capable of simple work, involving one or two simple steps, noting that her mental status evaluations while incarcerated and away from substances were mostly within normal limits, with intact memory, concentration, and attention. R. 77, 93, 98–99. The ALJ gave these opinions "some weight." R. 18.

### B. Mental Impairments under SSR 96-8P

Linda argues that the ALJ failed to properly assess her mental impairments as required by SSR 96-8P.  See Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996). Specifically, Linda asserts that the ALJ failed to properly consider her moderate limitations in concentration, persistence, and pace and "only addresses [her] ability to perform work and not her ability to sustain work."[12] Pl.'s Br. at 26, Dkt. 11. Also, Linda claims that the ALJ "failed to define exactly what he meant by 'no fast paced-production." Id.

---

[12] Linda also states that the ALJ failed to explain how her moderate limitations in understanding, remembering, or applying information, and interacting with others are accommodated by the ALJ's RFC. However, Linda provides no argument to specifically support these claims. Linda does assert that the ALJ failed to explain "what he meant by 'less than occasional interaction with co-workers." Pl.'s Br. at 27. However, I find that no further explanation of that term is required. Occasionally is defined in the Dictionary of Occupational Titles as an activity or condition existing up to 1/3 of the time, and furthermore, the jobs proposed by the ALJ all listed the interaction with people as "not significant." See DOT 222.687-014, 302.685-010, 299.667-014. Further, I find that the ALJ adequately explained and accommodated Linda's moderate limitations in understanding, remembering, or applying information, and interacting with others. The ALJ acknowledged Linda's testimony that she "cannot be around others" and "reported anger issues." R. 15. However, the ALJ noted that Linda's mental status examinations were generally normal, including memory, with exceptions for insight and judgment, and that the state agency psychologists found Linda retained the capacity to understand and remember instructions involving one or two simple steps. R. 15–17. Additionally, the ALJ explained that Linda was able to represent herself during the hearing, recall specific information about her treatment and work history, maintain a relationship with her fiancé, live with various family members, and attend group therapy. R. 14.

7

SSR 96-8P requires the ALJ to include a narrative discussion describing how the evidence supports his conclusions when developing the RFC. Teague v. Astrue, No. 1:10-cv-2767, 2011 WL 7446754, at *8 (D.S.C. Dec. 5, 2011). The ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8P at *7; Meadows v. Astrue, No. 5:11-cv-63, 2012 U.S. Dist. LEXIS 115150, at *24, 2012 WL 3542536, at *8 (W.D. Va. Aug. 15, 2012) (citing Davis v. Astrue, No. 9-cv-2545, 2010 U.S. Dist. LEXIS 132972, at *15-16, 2010 WL 5237850, at *5 (D. Md. Dec. 15, 2010)); Monroe v. Colvin, 826 F.3d 176, 189, (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often).

In Shinaberry v. Saul, the Fourth Circuit confirms that an "ALJ cannot summarily 'account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work,' because 'the ability to perform simple tasks differs from the ability to stay on task.'" Shinaberry v. Saul, 952 F.3d 113, 121 (4th Cir. 2020) (quoting Mascio v. Colvin, 780 F.3d 632, 638 (4th Cir. 2015)). However, the Fourth Circuit also clarifies that Mascio does "not impose a categorical rule that requires an ALJ to always include moderate limitations in concentration, persistence, or pace as a specific limitation in the RFC." Id. In contrast, Shinaberry highlights "sister circuits" who conclude that "limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations [in concentration, persistence, or pace]" when the "medical evidence demonstrates that a claimant can engage in simple, routine tasks, or unskilled work, despite [these] limitations." Id. (quoting

8

Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1180 (11th Cir. 2011)). Shinaberry further confirms that Mascio does not broadly dictate that a claimant's moderate impairment in concentration, persistence, or pace always translates into a limitation in the RFC, but instead underscores the ALJ's duty to adequately review the evidence and explain the decision. See also Monroe, 826 F.3d 176 (emphasizing that the ALJ must provide a sound basis for his ruling, including discussing what evidence he found credible and specifically applying the law to the record).

  This is not a situation like Mascio, where the ALJ summarily concluded that a limitation to simple, unskilled work accounts for the claimant's moderate impairment in concentration, persistence and pace without further analysis. Unlike the claimant in Mascio, the medical evidence here supports the ALJ's conclusion that, despite her moderate limitations in concentration, persistence, or pace, Linda is capable of performing the basic mental demands of working, with the specified accommodations. Further, here, the ALJ explained why Linda's moderate limitations in concentration, persistence, or pace, interacting with others, and understanding, remembering, or applying information, did not translate into a limitation in the RFC beyond the extensive non-exertional limitations imposed: simple, routine, and repetitive tasks; no fast-paced production; work in a low stress job defined as only occasional decision-making and only occasional changes in the work setting; occasional interaction with supervisors; less than occasional interaction with coworkers; no interaction with the public; and no exposure to hazardous machinery or unprotected heights. R. 14.

  As an initial matter, I find the phrase used by the ALJ here, "no fast-paced production" requires no additional explanation to understand its meaning. This phrase is not the same as the phrase "a production rate or demand pace," which the Fourth Circuit held the ALJ failed to

9

adequately explain in Thomas v. Berryhill, 916 F.3d 307, 312 (4th Cir. 2019), as amended (Feb. 22, 2019). The ALJ here also provided further explanation for this RFC limitation, indicating later in his opinion that production quotas are limited "since they could result in increased stress." R. 17. In fact, in Perry v. Berryhill, the Fourth Circuit specifically acknowledged it had previously found an ALJ adequately explained an RFC restricting the claimant to "non-production jobs," because additional descriptors, including work only in a low stress setting, and without any fast-paced work or public contact, provided context to permit the court to understand and evaluate the restriction and RFC. 765 F. App'x 869, 872 (4th Cir. 2019) citing Sizemore v. Berryhill, 878 F.3d 72, 80-81 (4th Cir. 2017). Accordingly, I am not left to guess what the ALJ meant when he included the limitation of no "no fast-paced production" in his RFC.

Second, contrary to Linda's argument, the ALJ adequately supported his finding that Linda could sustain her simple, routine, and repetitive tasks over a normal workday, and accounted for Linda's moderate impairments in both his hypothetical questions to the VE and the RFC finding in his ruling. The ALJ provided a detailed history of Linda's mental health issues, symptoms, and treatment, including her hospitalizations. The ALJ acknowledged Linda's "long history of substance abuse, mood disorder and borderline personality disorder" as well as "documented acute episodes of decompensation." R. 17. However, he wrote "the vast majority of the mental status examinations documented throughout the record have been normal" with the exception of impaired insight and judgment. Id. Indeed, Linda's mental status examination while in jail from May 2014 through December 2015 were generally normal. R. 266, 270, 277, 279. Likewise, after Linda's release from jail, her mental status examinations continued to be generally normal, with the exception, as noted by the ALJ, of impaired insight and judgment. R. 501, 530, 539, 752. In January 2016, Dr. Dean assessed her "substance use disorders as the

10

primary target of treatment." R. 501. Significantly, at follow up visits with her mental health practitioner in January, March, April, and June 2016, her reasoning, attention, concentration and memory were all normal. R. 501, 530, 539, 682, 752. Linda was hospitalized three times between July and September 2016 for mood disorders, suicidal ideations and polysubstance abuse; however, by November 2016, she indicated her life was beginning to stabilize, and she began a Suboxone program. R. 16, 403, 901, 923, 1010. Dr. Dean wrote in December 2016 that her sobriety had "ended her cycle of hospitalizations." R. 1045. Even after being discharged from the Suboxone program for marijuana use in March 2017, Linda's mental status examinations in May and October 2017 were largely normal. R. 1241, 1260.[13] See Shinaberry 952 F.3d at 121 (4th Cir. 2020) (noting that "[w]hen medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations.") (citation omitted). The ALJ also notes that Linda was able to "secure employment . . . and work full-time for several months" and focus and persist in applying for housing through HUD. R. 14, 17. Thus, the ALJ explains his conclusion that, despite her moderate limitations in concentration, persistence, or pace Linda "retains the capacity for simple, routine, and repetitive tasks." Id. The ALJ also gave some weight to the state agency psychologists, noting their finding that Linda could understand and remember instructions

---

[13] I recognize that Linda takes issue with the ALJ's characterization of her mental status exams as generally normal. Linda argues the ALJ ignored a number of records that provide "substantial evidence confirming the impact of plaintiff's mental impairment on her RFC." Pl.'s Br. at 29, Dkt. 11. However, the ALJ clearly understood Linda's mental impairments; he found severe impairments in bipolar disorder, anxiety and personality disorder, acknowledged her multiple hospitalizations, and accurately analyzed the medical records, including noting that impaired insight and judgment were an exception to her otherwise mostly normal mental status exam, "based on [Linda's] choices." R. 17. In support, the ALJ provided the example of Linda dropping out of the Suboxone program "because she was unwilling to give up cannabis." Id. At bottom, this amounts to a disagreement with how the ALJ weighed the evidence, but I cannot reweigh the evidence, or substitute my judgment for the Commissioner's. Mastro, 270 F.3d at 176 (citation omitted).

involving one or two simple steps, and complete a normal work day or work week without added supervision, but including additional limitations for low stress work and less interaction with coworkers and supervisors.[14] R. 18. Accordingly, I find that substantial evidence supports the ALJ's conclusions regarding Linda's RFC.

### C. Non-medical Third Party Statements

Linda argues that the ALJ improperly weighed the third-party written statements from her fiancé, father, and former employer. In support, Linda indicates that in discounting these lay opinions, the ALJ "seems to rely solely on the fact that the statements were not provided by medical sources." Pl's Br. at 30, Dkt. 11. The Commissioner counters that the ALJ considered each of these statements, and appropriately discounted them as being inconsistent with the record.

The ALJ may consider evidence from lay witnesses in assessing the severity of the claimant's impairments and ability to function; however, the ALJ is not required to give such non-medical sources significant weight. See SSR 06-03P,[15] 2006 WL 2329939, at *2. The Regulations provide that:

> In considering evidence from "non-medical sources" who have not seen the individual in a professional capacity in connection with their impairments, such as spouses, parents, friends, and neighbors, it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence.

Id. Contrary to Linda's arguments, the ALJ did not discount her non-medical source statements simply because they were not medical sources. The ALJ considered each of the statements,

---

[14] The ALJ further explained that "[p]roduction quotas and interaction with others is limited since they could result in increased stress." R. 17.

[15] Although SSR 06-03P was rescinded for claims filed on or after March 27, 2017, Linda's application was filed prior to this date and, thus, SSR 06-03P applies here.

12

assigned them specific weight, and adequately explained his reasoning. The ALJ did note that the statements submitted by Linda's father and brother were not provided by medical sources, but instead parties with a "vested interest in the outcome of the case." R. 18. The ALJ also emphasized that the statements were inconsistent with the record, including the mental status examinations and psychiatric treatment notes. Id. Likewise, the ALJ explained that the statement submitted by Linda's former employer was inconsistent with treatment notes and the ALJ's observations at the hearing.[16] Id. These reasons are specifically contemplated by the Regulations and I conclude that substantial evidence supports the ALJ's decision to give the non-medical third party statements little weight.

### D. Treating Physician

Linda argues that the ALJ erred by failing to give controlling weight to Dr. Dean's opinions. Specifically, Linda complains that the ALJ was unclear regarding his conclusion that the record contradicted Dr. Dean's conclusions, and did not address all the required factors under the Regulations. The Commissioner counters that substantial evidence supports the ALJ's assessment of Dr. Dean's opinions, and that the ALJ considered all the medical opinions in the record, including Dr. Dean and the state agency psychiatrists, and explained the weight he gave to each.

Dr. Dean wrote in his December 2017 treatment note that, "I will have to say that Linda looks the best I have seen her, relaxed and comfortable with me, non-anxious and well put-together. However, I do not believe she can survive in a workplace setting as she cannot offer

---

[16] Linda makes reference to the ALJ's "not[ing] [Linda] worked full time for the employer from May 2017 through the fourth quarter of 2017" but suggests "mathematical calculations" involving Linda's wages do not support a conclusion that she worked full time during that time period. Pl.'s Br. at 30–31. However, as pointed out by the Commissioner, Linda told her medical providers on multiple occasions that she was working full time during that period. D's Br. at 22, Dkt. 15.

13

speed, consistency and appropriate ability to manage conflict or follow directions." R. 1285. In a March 2018 letter, purportedly in support of Linda's disability claim, Dr. Dean wrote:

> [Linda] has great impairments in attention and concentration, distractibility, anxiety, and emotional regulation. She has an extended history of hospitalization for suicidal and self-injurious impulses. I do not believe she can survive in a workplace setting as she cannot offer speed, consistency, and appropriate ability to manage conflict or follow directions consistently. Normal workplace demands would overwhelm her coping. She does have a past history of substance abuse, and while she was using her functional ability was far worse. She has improved since she stopped using but remains impaired. I see [Linda] as 100 percent permanently disabled and unable to work.

R. 1309.

The social security regulations require that an ALJ give the opinion of a treating source controlling weight if he finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record."[17] 20 C.F.R. § 404.1527(c)(2); Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001); Brown v. Comm'r Soc. Sec. Admin., 873 F.3d 251, 269 (4th Cir. 2017) (noting that "the ALJ is supposed to consider whether a medical opinion is consistent, or inconsistent, with other evidence in the record in deciding what weight to accord the opinion"). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). The ALJ must give "good reasons" for not affording controlling weight to a treating physician's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Saul v. Astrue, No. 2:09–cv–1008, 2011 WL 1229781, at *2 (S.D.W.Va. March 28, 2011). Further, if the ALJ determines that a treating physician's medical opinion is not deserving of

---

[17] The social security regulations regarding the evaluation of medical opinion evidence have been amended for claims filed after March 27, 2017. See 20 C.F.R. §§ 404.1520c, 416.920c (setting out rules for claims filed on or after March 27, 2017, including that no specific evidentiary weight, including controlling weight will be given to any medical opinions). However, as this claim was filed prior to the effective date of the amended rule, I will apply the rules in 20 C.F.R. §§ 404.1527(c), 416.927.

controlling weight, the following factors must be considered to determine the appropriate weight to which the opinion is entitled: (1) the length of treatment and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the opinion's support by medical evidence; (4) the opinion's consistency with the record as a whole; and (5) the treating physician's specialization. 20 C.F.R. §§ 404.1527(c)(2)-(5), 416.927(c)(2)-(5). "None of these factors may be omitted or disregarded by the ALJ in weighing the value of a treating physician's opinion." Ricks v. Comm'r, No. 2:09cv622, 2010 WL 6621693, at *10 (E.D.Va. Dec. 29, 2010). However, the ALJ "need not mechanically discuss every factor when choosing to afford a treating physician's opinion less weight, as long as the ALJ articulates the reasoning behind the decision." Haass v. Comm'r, Soc. Sec. Admin., No. CV BPG-17-1639, 2018 WL 2118705, at *1 (D. Md. Apr. 4, 2018).

Here, the ALJ appropriately considered these factors and the record, in weighing Dr. Dean's opinion. The ALJ acknowledged that Dr. Dean was a treating physician and Linda's psychiatrist, but concluded that his opinion merited little weight because, "it is inconsistent with mental status findings, treatment notes, and reported activities of daily living." R. 18. The ALJ offered a specific example of the normal mental status exam from October 2017, which also indicated Linda had "worked ten days straight." Id.[18] The ALJ offered a second specific example where Dr. Dean wrote in October 2017 that Linda has "been able to hold a full-time job as a motel housekeeper" but has had issues with her attitude in the work setting.[19] R. 18, 1260. The ALJ emphasized the largely normal mental status exam and that Linda did not report anxiety,

---

[18] This mental status exam is generally normal, but indicates a hostile mood, and some recent memory issues, with Linda reporting "difficulty with memory." R. 1252.

[19] Of course, the ALJ did not find that Linda was capable of working as a motel housekeeper; indeed, he specifically found she was not capable of returning to her past relevant work. R. 19.

15

panic, or depression.[20] Id. Elsewhere in his opinion, the ALJ also noted the normal mental status exams during Linda's incarceration, as well as largely normal mental status exams following her sobriety in December 2016, with the exception "that often [her] insight and judgment were found to be impaired based on [her choices]."[21] R. 16–17. Further, the ALJ gave some weight to the state agency psychiatrists, who both found Linda was capable of working. R. 18. However, the ALJ imposed additional limitations beyond those recommended, on the grounds that "the evidence showed [Linda] required additional limitations for low stress work and less interaction with coworkers and supervisors." R. 18.

The ALJ adequately considered the factors outlined in 20 C.F.R. § 416.927(c)(2) and justified the weight afforded with specific reasons, including that, with the exception of the documented acute episodes of decompensation, the majority of Linda's mental status examinations have been normal, with the exception of insight and judgment, and, Dr. Dean's treatment notes reported Linda both secured employment and work full-time for several months. I also note that the ALJ is not required to give any special weight to an opinion on issues that are reserved to the Commissioner, including a "statement by a medical source that you are 'disabled' or 'unable to work." See 20 C.F.R. § 404.1527(d)(3); see Mickles v. Shalala, 29 F.3d 918, 923

---

[20] Similarly, this mental status exam is generally normal but indicates an angry mood and limited insight and impaired judgment. R. 160–61.

[21] The record includes numerous references by Linda's medical providers to the interrelated nature of her polysubstance abuse and mental health issues. However, the ALJ properly did not analyze whether Linda's drug abuse was a contributing factor material to disability, as he found Linda not disabled, even considering her drug abuse. R. 50; See As-Salaam v. Colvin, No. 1:15CV630, 2016 WL 6078336, at *4 (M.D.N.C. Oct. 17, 2016) ("[B]efore evaluating whether polysubstance abuse is a contributing fact to a finding of disability, the ALJ must first conduct the regular five-step disability inquiry to determine if a claimant is disabled, including as part of this inquiry the impact of any alcoholism or drug addiction. It is only after that point, if the ALJ finds that the claimant is disabled and there is 'medical evidence of [his or her] drug addiction or alcoholism,' that the ALJ then proceeds under § 404.1535 to determine whether the claimant 'would still [be found] disabled if [he or she] stopped using alcohol or drugs.'")(quoting 20 C.F.R §§ 404.1535).

(4th Cir. 1994) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]."). Having reviewed the record as a whole, I conclude that substantial evidence supports the ALJ's decision to discount the opinions of Dr. Dean.

### E. Subjective Allegations

Linda argues that the ALJ's assessment of her allegations is not supported by substantial evidence. In support, Linda references her previous arguments, specifically the ALJ's alleged errors in his assessment of her work activity, Dr. Dean's opinions, and the non-medical third-party statements. As I have already addressed these arguments, I will not address them again now. Here, the ALJ's opinion included a discussion of Linda's medical history, including her mental health issues, and polysubstance addiction and sobriety, along with her allegations, and the ALJ adequately supported his finding that Linda's allegations were not entirely consistent with the medical evidence and other evidence in the record.

At bottom, I find the record provides substantial support for the ALJ's decision, and the ALJ complied with the Regulations in assessing Linda's allegations. See Soc. Sec. Ruling 16-3p Titles II & Xvi: Evaluation of Symptoms in Disability Claims, SSR 16-3P, 2017 WL 5180304 (S.S.A. Oct. 25, 2017); 20 C.F.R. §§ 404.1529(b)–(c), 416.929(b)–(c).[22] Thus, the existence of evidence in the record that could support a different decision does not merit reversing the ALJ. Linda essentially asks me to reweigh the evidence that was before the ALJ and come to a different conclusion. However, it is for the ALJ to determine the facts of a particular case and to

---

[22] Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that the Social Security Administration has adopted. 20 C.F.R. § 402.35(b)(1). Once published, these rulings are binding on all components of the Social Security Administration. Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984); 20 C.F.R. § 402.35(b)(1). "While they do not have the force of law, they are entitled to deference unless they are clearly erroneous or inconsistent with the law." Pass v. Chater, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995).

resolve inconsistencies between a claimant's alleged impairments and her ability to work. See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996); see also Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight). The ALJ's opinion was thorough and applied the proper legal standard, and I will not re-weigh the evidence. Accordingly, I conclude that the ALJ supported his analysis of Linda's subjective complaints with substantial evidence, and that Linda is capable of performing work at the level stated in the ALJ's opinion.

## **CONCLUSION**

It is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The Clerk is directed to transmit the record in this case to Elizabeth K. Dillon, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objections, including the waiver of the right to appeal.

Entered: February 11, 2021

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge